Case No. 13-1414, Thilitha Clements v. Prudential Protective Services, Oral Argument not to exceed 15 minutes per side. Heidi Sharp for the appellant. Good morning, Your Honors. May it please the Court, Heidi Sharp on behalf of the appellant, Thilitha Clements. I've already indicated to your deputy that I'd like to reserve two minutes for rebuttal. Your Honors, there are three particular aspects of this case that came before the District Court. The first issue, the District Court found in my client's favor, but I believe that that opinion should be carried throughout the rest of the opinion, which is where the District Court, I think, made material mistakes, and that's why we're here today. In the first issue, the District Court found that the defendant should be stopped from denying liability for any potential noncompliance violations that my client may have had because of the fact that the defendant did not provide her proper notice under the FMLA. When we go to the second issue, which is on appeal before this Court, I believe that the District Court was incorrect in asserting that plaintiff was not prejudiced by a defendant when she was not returned to her prior position following her leave. I believe that this issue is at the very heart of the FMLA and the federal requirements that employers have for employees. Not only do they have to give notice and provide the leave, which the District Court found she received, but bring her back to work. If she doesn't come back to work, the FMLA is essentially useless. The time off is what employees get when they have no FMLA. They simply quit or are terminated. It's bringing her back to work that is so important, and that is what didn't happen here. When she didn't come back to work, she was prejudiced. When she didn't work, she had monetary losses. Monetary losses is explicitly within... Did she ever try to get a job at another facility? At another facility with a defendant? I'm even wondering today if she could get a job at another facility. With defendant or another employer? Defendant. I mean, I thought what was going on is this one facility where she worked before, if you believe the defendants, didn't need as many folks in this position, but that didn't mean there weren't other facilities within the geographic area. I'm just curious. Yes. No, Your Honor, that's a very good question. She essentially did not know that there were other facilities available. How about today? Today, the only... There has never, ever been an unconditional offer of reinstatement made to my client. Maybe just put the lawyering to the side. I mean, can you... Has anyone thought to just ask, can she get a job at one of these other facilities today? There have been discussions through settlement, Your Honor, but I feel that because those settlement discussions were essentially confidential, I cannot discuss that with you. Okay. Okay. Well, maybe keep the confidential settlement discussions going so that one day you can have a public resolution of this lawsuit. I'm just puzzled why we can't solve the case that way. Of course, that's our goal. It looked like to me that she preferred not to go back to work because what she wanted to do was to get unemployment compensation. Oh, no, Your Honor. Oh? That is not the case for sure. Where was it? When did the lawyer, her lawyer, you or whatever lawyer she had, first get into the case, and why didn't somebody call the employer and say, you know, you're not following the... It sounds like neither one of them knew what the Family Medical Leave Act says in it. That's true, Your Honor. And what happened was the employer never gave her any notice, so she didn't know about the FMLA. She knew that she was entitled to what she just called maternity leave, and she expected that after maternity leave she'd be returned to work. In July 2009, she asked to be returned to work, and Lamont Lively, her supervisor, told her that there were no jobs available. After being turned down by him... In one place. But he didn't tell her there were no jobs available in any place. He also did not tell her that there were any jobs available anywhere else. And that's specific in the testimony. She testified he never told her, if you go to the office, they'll give you another job. So she did not know at that time. So after being turned down for a job... There's a dispute of fact, isn't there, about whether she was told to go to the office or not go to the office? Or maybe there isn't any dispute of fact about that. You're correct, Your Honor. There is a material fact question here because she testified that she was not told to go to the office to get a new job, and Mr. Lively did testify that he would have told her,  On the first maternity leave, when she came back, her old job was not available either. But at that point, did Mr. Lively offer her the guard position? Yes, Your Honor. So she calls in and says, I'm ready to come back. And he says, I'm sorry, you can't have your old job back. That's not available. Here's another option. I'm trying to struggle with what she knew from her last experience on maternity leave. And what had happened prior was she had maternity leave. She arranged it all with Mr. Lively, never went to the office, never knew anything about the office. She says, I'm ready to come back. And she had had, we'll call it a nicer position, at the front desk. Essentially, when you go into a corporate building, you see someone who checks you in at the front desk. Well, he had had to put someone in that position while she was gone. So he says, well, I'm going to keep that person there, but I'll give you a guard position, which is a roaming position. But he maintained her same pay. The problem being, though, that, of course, he wasn't aware of the FMLA and was unaware that he should have put her back at the front desk. But because it was the same pay, she accepted the position. Same building, same style, same uniform, nothing different about her benefits or pay. And so she goes back to work. And this follows up with the question presented by Judge Merritt. You asked, it doesn't appear that she doesn't want to go back to work. The only reason she applied for unemployment is because they didn't put her back to work. And as someone who makes about $9 an hour at the time, she needed some income coming in. And so it was pretty much just to feed her family is the reason for the application for unemployment. I accept all that. I will say, if you win this case, there's going to be a lot of people in your client's position that will be hurt by the outcome. And I'll tell you why. Because what happened is your client came to them and was actually seeking help from the employer, saying, OK, listen, I can't get the job in the news center. Now give me a piece of paper that shows I've been laid off. And that's what she needed to then get unemployment. Well, I can't imagine a company doing that in the future without at that point saying, OK, listen, first of all, we're not sure we really laid you off. But if you really want this piece of paper, we'll sign it. But we want you at the same time to say you're not going to sue us using this piece of paper as the predicate for your claim. Because it becomes highly relevant evidence for the FMLA claim, the phrase laid off. And so it puts everybody in a bit of a bind. And I realize I'm not saying this is what your client was trying to do. I'm just telling you the practical realities of what has now happened in the case. It's Exhibit A for why there's an FLMA claim. Well, I disagree. And I understand the practical reality. And I see what you're saying. But first, that often happens. As a plaintiff's employment attorney, often someone will be let go, laid off, need to apply for unemployment. And in the negotiation, they are determined to be laid off and essentially to accept unemployment. And they waive away their rights to a potential claim. I see that happen very often, whether it's negotiated by the employee or the employee's attorney through what is basically a severance agreement. That doesn't sound like a great thing. And I think that's what you're saying. And I'm agreeing with you. It doesn't sound like a great thing. And I think this case would lead to more of that. But she didn't want to. Would this lead to more of that if what this case does is resolve the failure of the employer to give information on the FMLA? Because in the future, isn't what will happen that this employer will now say, oh, here are your FMLA rights. Here's the information on them. Do you, you know, then the employee will have to say, I want maternity leave and I will come back. But that's not a bad thing, Your Honor. No, it's not. It seems to me that that solves the problem of the laid off issue. Because in the future, the employees will know what they're supposed to do. The employer will give them that information. And then they will honor the FMLA. Yes. And that's where I said, you know, the district court did get it right by saying, hey, the employer didn't have any notice provisions. It didn't follow the FMLA. If this employer had simply followed the FMLA. The notice problems require prejudice. Yes. And the key evidence of prejudice is laid off. No. And that was the argument I was getting to before. So you're not using that as part of your prejudice argument? It is part of it. But essentially, the key is, she wasn't brought back to work. In July 2009, she says, I'm ready to come back. The layoff doesn't occur until the end of August 2009 when they still haven't brought her back to work. And at that point, you know, one of the questions was, you know, won't this prevent employers, you know, would they not hand out a letter like this in the future? First of all, she didn't request this letter. She went and said, you haven't brought me back to work, and I would like you to fill out this form for my credit card, which is similar to the forms employers often fill out for disability. She didn't ask for the employment form for unemployment. She didn't want it. She testified that she went in, gave them the form for her credit card, and at that time they came back with that form and they refused to fill out the new credit card form. So as far as employers responding to unemployment, they have a duty to respond to unemployment claims. She had already applied for unemployment at that time and didn't even need that letter. In Michigan, the unemployment determination is made by the Unemployment Insurance Commission, not, you know, the employer. The employer doesn't decide whether you get unemployment. I'm sure that's very similar in all the states of the circuit. The prejudice is that she was never returned to work, whether they called her laid off, terminated, we just don't have a job for you, although there was jobs. The testimony, I'm sure you'll agree, was uncontroverted. Mr. Keywell said there was jobs and that they were continuously hiring at that time and there would have been jobs in other areas, but they never tell her, go report to the building on Jefferson in Detroit, Michigan, that's your new job. And the evidence is clear that no one ever told her this is the position you report to because the district court found that there was no rules, regulations, policies, any compliance with the FMLA. She didn't know whether to go to the office. She didn't know to report to Mr. Lively. She kind of thought maybe she could have a choice there to go to the office or to receive unemployment benefits. Possibly. I've never heard her testify to that or in any of the discussions. I believe it was her understanding she follows up with Mr. Lively just as she had done with the first pregnancy. The first pregnancy she calls him and he gets her back to work. So at that point she didn't understand why anyone else was involved because he was her supervisor. He scheduled her. The idea that she thought she had a choice is consistent with a letter from Danielle Todaro so she could get a layoff situation and start drawing unemployment. Ultimately, though, her choice is not to be laid off and get unemployment. She only obtained unemployment because they refused to return her to work. Her choice was never layoff or work. She wanted to work. That's why she went to the office and the district court did find that from July 2009 to August... Why didn't she ask for other jobs? She didn't know that any were available, Your Honor. She didn't understand that. And, you know, as you can see, I'm sure from the facts, that this is a very loosely run company. No policies, no procedures, no handbook. Mr. Keywell clearly testified that if someone even asked about the FMLA, he would just refer them to the statute. Essentially, his testimony demonstrates their flagrant disregard. So Judge Rosen says, hey, you know, you made mistakes on your notice. There were clearly errors there. But no prejudice because there's this testimony that, well, she would have been laid off anyway because they had to cut all these jobs. Is your argument on this prejudice point, well, that's not quite right because the only evidence is they were going to cut jobs in this one facility. It doesn't prove she could have had a job in one of these other places. Is that your key point there, would you say? Yes. I think that essentially, I know I have to wrap up shortly here, and that essentially encompasses my response to both of his areas in which I believe he was incorrect. Because they didn't return her to work and always had the opportunity to return her to any other facility, she's prejudiced. She has monetary losses. She's unable to return to work. And at the same time, they demonstrate that she was not laid off because they say that there were other jobs. Okay, great. Thank you very much. Mr. Hamden. Good morning, Your Honors. Pleases this Court, Dominic Hamden. So can we resolve this case by just giving her a job in one of these other facilities? She seems to want to work, and she's fighting pretty hard to get a job back. Why not give it to her? And my client has maintained the position from day one. If she wants to be assigned, she merely has to go to the office to be assigned. You're at the office right now. Your Honor, if I could get my client on the phone and find a job for her, I would do it out in the hall right now. Why don't we do that? If the Court wants to pass this matter to the end of the docket, I will make the phone call. I have no problem whatsoever making that phone call. Respectfully, to the Justices, I don't believe. Too respectful. I don't believe that's the holdup here. I really don't. Presupposes that she would agree to that, right? Doesn't she want to work there? The problem at this point, essentially, is that we are not looking at the Mellon guidelines because the jobs that she can offer, Your Honor, without going into a settlement discussion, are not at the same pay and benefits. Okay, all right, good follow-up question. Can we give her a job with the same pay and benefits as before? The discussions which have occurred previously didn't. I don't care about settlement discussions. I'm just asking a present-tense question. Can she get a job with the same pay and benefits as before? I'm sure those jobs are absolutely available. There are going to be a few slight issues that are not really, I think, going to be issues, which one would be because of the length of time before she hasn't worked, she's going to have to pass security background with the State of Michigan. There's fingerprinting and some other things which have to occur. But my client has maintained from day one, if she wants to go back to work, they put her back to work with no change in pay. Or benefits. Or benefits, yeah. Her benefits, Your Honor, she was not receiving medical insurance or any other benefits in that sense of the word. She was receiving paid time off, sick leave. Check with your client and see because it may be that otherwise you're going to have to have a trial, you know, that kind of thing. Again, I do not believe that that is the hang-up here. I do not believe her reinstatement is the issue. I mean, are you just making a point about attorney's fees and stuff? I'm making a point as regarding attorney's fees and the amount of damages which have been requested during discussions. Yeah. Well, geez, how do these cases get away from us? When you think in terms of damages from somebody who makes $9 an hour versus the fees that attorneys charge to try a case, it just seems to me that you're going to save money if you work something out. There's definitely an offset. I'd say there's more than an offset. I'd say there's a cliff edge difference in what those costs would be. I would not disagree with the court. Okay. Well, go call your client. That's what I would say and see if you can settle this darn thing. Judge Merritt has a lot of wisdom. He's seen a lot of these cases. I have no issue making the phone call. The court will reserve my last 1130, I take it, if needed. What's that? I think he's making the point. He'll make the phone call now, but if the phone call doesn't go so well, he'd like 11 minutes of argument time. And I'll give it to you. Great. Go to the hall, and you guys will circuit back. Just go talk to your clients. Go talk to your clients, and we'll hear the other cases. And if you're still here, I'll be all ears. All three of us will all be all ears. All right, thank you. The case will not be submitted. Which is to say, go talk, and we'll talk to you after these other arguments are done. Thank you, Your Honor. Thanks very much. The clerk may call the next case. We have no chance to confer. We are still in the same place that we always have been. Although my client is invited to come back, it is only if she waives her current claim. Okay, say that again. Oh, I see. So you're telling us what the settlement offer is and why you're rejecting it. Yes. My client's position, Your Honor, is, and I'm still on the clock. Yeah. Maybe I'm on the clock. I'm on the clock. My client is maintaining the same position. That is, they are ready, willing, and able to reinstate Ms. Clements or reassign her as early as next week. They are willing to assign her at a premium position at a higher rate of pay than what she was even receiving. The issue that comes up, and I take the judge's comments into light and have relayed those to my client, comes to the amount of other damages which are being requested. Come to what? What's the last thing you said? To the other damages being requested. In other words, the dispute now is about the damages and attorney's fees, presumably, to which Ms. Clements is entitled. His client's willing to give her a new job and apparently a higher-paying job, although God only knows what that means in relation to the damages. Fair, Your Honor. Premium positions, just for purposes of clarity, could be front desk jobs, which technically usually pay $0.50 to $1 more an hour. Armed guard positions can pay up to $3 or $4 more per hour. But I don't know whether or not she would qualify because Michigan would require a CCW permit, and I don't know if she has one. How does it work in this case? I don't remember the complaint. Is the complaint for reinstatement, or is the complaint only for back damages? I believe counsel asked for equitable relief as well. Okay. Sorry, I don't know if the Court has any other questions for me. And I have a couple of, Your Honors, I've obviously read the briefs, read the facts, and I appreciate always having an active panel. I do want to make a quick point regarding a question which was raised by Judge Merritt, and specifically whether or not, I believe the question was whether or not she knew that she had the opportunity to seek reassignment at the office. There may be a question of fact regarding whether or not she was directed to go to the office. Mr. Lively testified on numerous occasions that he directed her to go there. But she did testify that she knew she could go there. She also testified that she knew she wasn't employed for this particular job site, but that she was employed for Prudential generally and could be reassigned at any particular time anyway. How can you take the position she wasn't laid off after the leave when your company, wisely, unwisely, better or worse, signed something saying she was? Doesn't that at least create a fact dispute? I don't think it particularly matters how it's contexted, and counsel actually made an argument on direct. Whether we characterize it as laid off, eligible for reassignment, the result and the facts are the same, that the new center buildings were suffering from significant loss. There was some testimony, I believe. Doesn't it create a dispute because one other employee in the office sent a letter to unemployment that said that the plaintiff had quit, that she was going to be a stay-at-home mother? And again, I don't think that difference particularly matters. And if you look at all of Lamont Lively's testimony, those two fact scenarios are actually consistent with each other. His testimony was that she had informed other employees there that she may not return to work and that she may be wanting her unemployment benefits to run out before she sought out reassignment. So it's quite probable that she applied for unemployment and that my client responded to say, hey, she told us she was going on unemployment and that she may not be returning back to work. And then she came in and said, I want to be reassigned, and there's nothing there. Those two fact scenarios are not necessarily, the point I guess I'm trying to make, are not necessarily in opposite to each other. You can read those together. Isn't there a problem with your position that you never, that she was an employee all along, could remain an employee, all she had to do was come back in and say, I want a job at another spot, and she gets it, yet you've created a dispute of material fact by your own action of sending a letter that says, no, she quit, we're done with her. I don't believe so. I think you can read those facts consistent with one another and still reach the same result, which was that the new Center One buildings weren't operating as they were. The testimony is somewhere between a 50 percent to a 33 percent reduction in force. But if she had quit, there wouldn't be any reason for her. Why would it matter what happened at her own building? I guess we could look at it, we could play both fact scenarios out to the extent to which we can. Do you get to do that if the issue of whether you have to go to trial is whether there is a disputed issue of material fact? And if there's a disputed issue of material fact, summary judgment doesn't work. I understand, Your Honor, and I understand the burden, and I understand that the evidence needs to be taken in her favor. I understand that, and I understand the reviews de novo. The point that I'm making is I don't believe those two facts are an opposite. You can believe that my client sent that letter. We can take that fact scenario as true, that she informed Lamont Lively that she may or may not be returning to work, and that she applied for unemployment while she was on FMLA leave and still come to the same result, which is no work at the new center building. The result is the same, and that's uncontested. So just one thing, I think I asked this before. I just want to make sure I'm getting it. So Judge Rosen's key move in his analysis is, hey, there's no prejudice because the new center cut back. There wasn't going to be a job anyway. It's just bad luck. But how does that work with the point that there were other places with other jobs? I guess that's the thing I'm not totally grasping. How can you maintain no prejudice if there was the option of going to another location? She was eligible for reassignment. She knew that she was eligible for reassignment. There's conflicting testimony on whether or not she was directed to go and seek reassignment, but she knew that she had the ability to go seek assignment at the office, and she didn't. So I believe the analysis Judge Rosen is doing is he's saying, there's no prejudice because you're right where you were anyway, eligible for a reassignment, which she knew. And she was in the office twice and never once asked to be reassigned. Instead, she was having credit card forms filled out so she could defer payment and collecting unemployment. Okay. I think we understand your position. Ms. Sharp, if you want to just come up for a minute or two, what's your answer to this last point? Their view is that there's no prejudice in one sense. The new center was going to lose jobs anyway, and she knew she could apply for other jobs and she didn't. So how do you answer that? I answer that by saying that the testimony was clear. On or about August 24th, when she's at the office and she says, I'm still on leave, Danielle Todaro says, Why are you on leave? She says, I haven't been given a new job. And Matthew Keywell says, and it's right in Judge Rosen's opinion, when he heard that she wanted some forms filled out for leave, he didn't tell her about any other positions available. So at that time, she's saying, I'm on leave, they haven't returned me. That's their opportunity to say, Oh, we've got these other jobs here. Why don't you go work there until the new center becomes available again? So there's no other evidence, because now is your time to deal with it. I have one other. There's no other evidence where she seems to be aware that she could apply for other locations. You're saying there just isn't. There is not. She specifically testifies that she's never told to go to the office to get a new job. And I think what's more important is prior to that happening, you have to look at what the prejudice is. Was there any evidence that she was aware of the possibility of applying to another location? She knew throughout her employment that her job was not in the new center, but that she could go to other jobs. She did not know about that upon her return from leave. How would that suddenly change? If you always know that, why would taking leave take that information out of your head? Because that's the point of leave. You go on leave, and you return to your prior position, just like it happened with her first pregnancy. She returned from leave, and she returned to the new center. She knew Mr. Lively was her supervisor. She looked to him for vacations. She looked to him for all of these things. You said she knew her job wasn't just at the new center. It seems like a semantic game. If you know your job can be new center in these other locations, it seems very funny to say, coming back from leave the second time, why wouldn't I ask for a job in the other locations? I just don't get it. I think that we're missing the point, that even if she did know that there was other locations that she could work at because Prudential had security guards in other locations, she didn't know those jobs were available when she returned from leave. She goes to the office and says— She has no duty to just ask. There is testimony that she asked, and Mr. Keywell did not tell her, nor did Ms. Todaro. Wait, so where's the evidence that she said, are there other jobs, and someone said, no, there are not? That question was not asked in her deposition, Your Honor. Ms. Todaro gave her the layoff letter at that time. So you're saying there's—I'm still missing the point. Why doesn't she ask? Why doesn't she ask? Why doesn't she ask? I can only represent that based on my conversations from her rather than the testimony at this time. And based on the information she's provided throughout this case is she doesn't know that she needs to ask, frankly. All right, well, thanks to both of you. When did she find out the first time, according to your submission, that she could go to work at another job? In 2011, Your Honor, and that goes to your point prior, is when did the attorneys get involved and about the damages, and I would beg the court for a moment to just address that issue. In 2011 is the first time she sought representation in this issue, and she then acquired an attorney at that time. And I understand the court is really looking at the ultimate resolution in this case, and that's where I'd provide that the ultimate resolution comes from both this court's decision and potentially a jury. So the first time was when she found a lawyer or talked to a lawyer, is that right? Yes, she did. And did the lawyer find out for her that she could, by talking to the client, by talking to the company or the company's lawyer, that she could go back to work or not? Only after some time in litigation, Your Honor. A complaint was filed, and then there was a discussion. Were you the lawyer she first sought out or not? An associate at my firm was. I did not have the initial consultation. And you never called the employer to ask, can she go back to work? At that time, no. A complaint was filed because of a statute of limitations that was shortly upon us. It was within 30 days. After the complaint was filed, there was some initial discussions about returning to work. But again, it wasn't clear until a settlement conference after discovery that she could go back to work at that time. And all these offers to go back to work are contingent on dropping claims? Yes, Your Honor. Otherwise, she can't just go back? Because sometimes people take people back to mitigate damages. Yes, that's clear. There is no unconditional offer of reinstatement that's ever been on the table. It's only, we'll give you a job if you drop your case. So that means the whole fight is about back pay and attorney's fees? That's what you guys can't get together on? Yes. You want your fee? No, it's not my fee. It's both. It's both. And just to put it into some really, at $9 an hour, it's about $30,000 a year, times two years by the time she found us, times four and a half years now. Wouldn't you subtract from that the unemployment she got? I do not subtract unemployment under case law in Michigan, Your Honor. You get both? You get both. Oh, now I understand. Now I understand the position she's taking. And with liquidated damages, we're at $300,000, Your Honor, to date, and it continues until we get a jury trial. Well, listen, you guys, the parties are way better than we are at figuring out your own interests. I will tell you, if it goes to a jury trial, you may be able to get over Judge Rosen's ruling. There's a lot of equities in both directions, I would say, at a jury trial. That's one thing that seems very clear to me. There's a lot of facts that would be presented to the jury, and I'd like them to hear it, Your Honor. In both directions. Yes. Okay. I agree. Thanks to both of you. Keep talking. It's a good idea always to let you control the outcome rather than us control the outcome, or for that matter, a jury. I agree, Your Honor. All right. The case will be submitted. The clerk may recess court.